UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
CENTRAL DIVISION at LEXINGTON

CIVIL ACTION NO.  5:12-cv-178-KSF

LIBERTY CORPORATE CAPITAL LIMITED                                    PLAINTIFF

VS.                                        **OPINION & ORDER**

SECURITY SAFE OUTLET, INC., *et al*.                                DEFENDANTS

* * * * * * * * * * *

This matter is before the court on the motion of Plaintiff, Liberty Corporate Capital Limited ("Liberty"), for summary judgment [DE #37].  The motion having been fully briefed, this matter is ripe for review.  Although Liberty has requested oral argument on its motion, this request will be denied, as the Court sees no need for oral argument.

## I.      FACTUAL BACKGROUND

This case stems from an underlying case filed by Budsgunshop.com, LLC ("BGS") against Defendants Security Safe Outlet, Inc. d/b/a Bud's Gun Shop ("SSO") and Matthew Denninghoff, in which BGS alleges that SSO and Denninghoff misappropriated BGS's trade secrets by improperly accessing BGS's customer database and obtaining and using confidential customer information, including customer email addresses, for their commercial benefit [*Budsgunshop.com, LLC v. Security Safe Outlet, Inc., et al.*, Case # 5:10-cv-390, pending in the United States District Court, Eastern District of Kentucky].  Pursuant to insurance policies issued by Liberty to SSO, SSO seeks a defense and indemnity for itself and Denninghoff with respect to the claims alleged against them by BGS.  Liberty has filed the instant declaratory judgment action, seeking a declaratory judgment that, under the policies at issue, Liberty is not obligated or required to indemnify and defend SSO

or Denninghoff against the claims made against them by BGS in the underlying litigation and, further, that Liberty has no other obligation or duty to either BGS, Marion E. Wells, Jr., Rex McClanahan, or any other party, arising out of the claims made in the underlying litigation. Liberty has now filed a motion for summary judgment in its declaratory judgment action.

      A.    The Underlying Lawsuit

In order to consider Liberty's motion for summary judgment, a brief explanation of the claims made by BGS in the underlying litigation is required. According to BGS's second amended complaint, SSO was formed in June 2000 by Wells, with Wells as the sole shareholder [5:10-cv-390, DE #73]. Under the name "Bud's Gun Shop," SSO operated a retail store in Paris, Kentucky, selling security safes, firearms and related accessories. Around February 2007, Wells and Earley M. Johnson, II entered into a Stock Purchase Agreement whereby Johnson purchased a minority interest in SSO. In May 2007, Wells and McClanahan formed BGS for the purpose of selling firearms and related goods over the internet.

In April 2009, pursuant to a Stock Redemption Agreement entered into by Wells and Johnson, Johnson gained control of SSO through a buy-out of Wells' interest in the company. As part of that transaction, SSO transferred its federal and state trademark rights in the tradename "Bud's Gun Shop," as well as variations of that name, to Wells. Pursuant to a Tradename License Agreement (the "Tradename License Agreement"), Wells then licensed back those rights on a limited basis to SSO to be used solely for a retail firearms store physically located in Paris, Kentucky, and/or a shooting or firing range business. According to BGS, because the parties anticipated that BGS would maintain the exclusive use of these rights in connection with its online retail business, these rights were not licensed to SSO for use in connection with the online sale of firearms. Wells has since assigned this License to BGS, along with the unregistered "Bud's Gun

2

Shop" trademark.  Section 2 of the License provides that SSO's use of the tradename shall discontinue if, over any one calendar month period during the term of the License, SSO's over-the-counter sales of firearms from its retail store comprise less than 85% of SSO's total sales of firearms for that month.  The License further provides that, should SSO breach or fail to comply with any of the terms of Section 2 of the License, the License shall immediately terminate and SSO shall cease using the tradename.  BGS alleges that SSO's over-the-counter sales of firearms from its retail store have comprised less than 85% of SSO's total sales of firearms in one or more months since the License was executed, thereby causing a breach and immediate termination of the License.  BGS further alleges that SSO has knowingly continued to use the "Bud's Gun Shop" mark in a variety of ways to promote its business with its suppliers and the consuming public, notwithstanding the termination of the license.

After the April 2009 transaction, BGS and SSO continued to maintain a business relationship, pursuant to which BGS would use SSO as one of its suppliers to fulfill online orders. In order to obtain customer and order information necessary to fill specific orders, SSO was provided with limited access and limited authorization to BGS's computer network system.  SSO disputes whether its access and authorization to BGS's computer network system was as "limited" as alleged by BGS.

Prior to January 2010, Denninghoff was an employee of BGS, working on information technology matters and in the coding, design, and implementation of BGS's website.  In January 2010, Denninghoff quit his job with BGS and began working with SSO.  SSO's Vice-President is Denninghoff's sister, Jennifer Arnett.  BGS alleges that, before quitting his job at BGS, Denninghoff erased the entire contents of the hard drive of the computer that BGS had provided to him and informed BGS that he would return only the hardware and software initially provided by BGS.

Despite hiring a third party computer forensics expert to attempt to retrieve the deleted contents of Denninghoff's work computer, BGS alleges that it has been unable to recover the contents of the hard drive. BGS also asked Denninghoff to provide the source code and other work product he created while a BGS employee. However, BGS alleges that Denninghoff indicated that the work product belonged to him, his source code was stored on his own personal server and he provided only a marginally useful computer code to BGS. BGS alleges that it was required to hire another third party contractor to reconstruct the incomplete computer code into a workable program.

In April 2010, BGS learned that SSO was launching an online presence for the purpose of selling firearms and related goods over the internet, thereby placing the two companies in direct competition. Upon learning this information, BGS terminated all access by SSO to BGS's computer network system. However, beginning in September 2010, SSO began sending mass emails to BGS's customers regarding its new competing firearms business. BGS alleges that, in order to do so, SSO and Denninghoff improperly obtained BGS's customer's email addresses from BGS's customer database. Specifically, BGS alleges that it has discovered that, despite erasing the contents of his work computer, Denninghoff secretly kept much of the data from his work computer, as well as numerous backup copies of BGS's customer database from various backup dates, in his possession. According to BGS, SSO and Denninghoff used this information to obtain BGS's customer's email addressees.[1]

Based on these allegations, BGS alleges the following counts: (1) Count I - misappropriation of trade secrets in violation of K.R.S. §§ 365.880, *et seq.*; (2) Count II - violation of the Lanham Act,

---

[1]SSO and Denninghoff do not dispute that Denninghoff provided the backup copies of BGS's database to SSO and that SSO used BGS's database in its entirety to send out email advertising "blasts" to the email addresses contained in the database. Rather, SSO and Denninghoff maintain that SSO was entitled to do so. [DE #38 at p. 3].

4

15 U.S.C. § 1125; (3) Count III - breach of contract - Tradename License; (4) Count IV - breach of

fiduciary duty (against Denninghoff); (5) Count V - aiding and abetting breach of fiduciary duty

(against SSO); (6) Count VI - breach of contract - non-compete agreement (against Denninghoff);

(7) Count VII - tortious interference with contract (against SSO); (8) Count VIII - violation of 18

U.S.C. § 1030(a)(2)(the "Computer Fraud and Abuse Act"); (9) Count IX - violation of 18 U.S.C.

§ 1030(a)(4); (10) Count X - violation of K.R.S. § 434.845 (unlawful access of computer); and (11)

Count XI - violation of K.R.S. § 434.855 (misuse of computer information) [5:10-cv-390, DE #73].

The underlying litigation between BGS, SSO and others is currently pending in this Court.

      B.     Liberty's Declaratory Judgment Action

     From approximately 2008 through 2012, SSO purchased a series of commercial general

liability coverage policies from Liberty.[2]  Each of these policies provided certain commercial general

liability coverage to SSO, pursuant to specified terms, conditions and exclusions.  On October 21,

2011, SSO made a claim for coverage under one or more of these policies seeking a defense and

indemnity for both SSO and Denninghoff with regard to the claims made against them by BGS in

the underlying lawsuit.[3]   On June 1, 2012, Liberty filed its complaint in the instant case, seeking a

---

    [2]Specifically, the following policies are relevant to this litigation: Policy Nos.
L200805866, effective September 27, 2008, through September 27, 2009; L201005866, effective
September 27, 2010, through September 27, 2011; L201105866, effective September 27, 2011,
through September 27, 2012 (collectively "Policies"); and Policy No. 200905866, effective
September 27, 2009, through September 27, 2010 (the "2009 Policy").

    [3]According to Liberty, because of the manner in which SSO and Denninghoff sought
coverage, it is not clear which specific policy or policies are at issue.  However, Liberty contends
(and SSO and Denninghoff do not dispute) that this issue need not be resolved, as the substantive
provisions of the policies at issue are identical.  Accordingly, the parties both refer to the policies
collectively as the "Policy."  Following the parties' lead, the Court will do the same.

declaratory judgment that no coverage exists under the Policy for SSO's insurance claim.  Liberty has now filed a motion for summary judgment in its declaratory judgment action.

## II.    STANDARD OF REVIEW

Under Rule 56(a) of the Federal Rules of Civil Procedure, summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). In reviewing a motion for summary judgment, "this Court must determine whether 'the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law.'" *Patton v. Bearden*, 8 F.3d 343, 346 (6th Cir. 1993) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-52 (1986)).  The evidence, all facts, and any inferences that may permissibly be drawn from the facts must be viewed in the light most favorable to the nonmoving party.  *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

Once the moving party shows that there is an absence of evidence to support the nonmoving party's case, the nonmoving party must present "significant probative evidence" to demonstrate that "there is [more than] some metaphysical doubt as to the material facts."  *Moore v. Phillip Morris Companies, Inc.*, 8 F.3d 335, 340 (6th Cir. 1993).  Conclusory allegations are not enough to allow a nonmoving party to withstand a motion for summary judgment.  *Id.* at 343.  "The mere existence of a scintilla of evidence in support of the [nonmoving party's] position will be insufficient; there must be evidence on which the jury could reasonably find for the [nonmoving party]."  *Anderson v. Liberty Lobby, Inc.,* 477 U.S. at 252.  "If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted."  *Id.* at 249-50 (citations omitted).

6

III.    **ANALYSIS**

A.    Applicable Law

In exercising diversity jurisdiction in this case, the court must apply state law in accordance with controlling decisions of the highest state court. *Bailey Farms, Inc. v. NOR-AM Chem. Co.*, 27 F.3d 188, 191 (6th Cir. 1994). Under Kentucky law, interpretation and construction of an insurance contract is a matter of law for the court. *Kemper v. Heaven Hill Distilleries*, 82 S.W.3d 869, 871 (Ky. 2002). According to the Kentucky Supreme Court:

> [A]s to the manner of construction of insurance policies, Kentucky law is crystal clear that exclusions are to be narrowly interpreted and all questions resolved in favor of the insured. Exceptions and exclusions are to be strictly construed so as to render the insurance effective. Any doubt as to the coverage or terms of a policy should be resolved in favor of the insured. And since the policy is drafted in all details by the insurance company, it must be held strictly accountable for the language used.

*Eyler v. Nationwide Mut. Fire Ins. Co.*, 824. S.W.2d 855, 859-60 (Ky. 1992)(citations omitted). However, such canons are applicable only "when the language of the insurance contract is ambiguous or self-contradictory. Otherwise, the contract is to be read according to its plain meaning, its true character and purpose, and the intent of the policies." *Peoples Bank & Trust Co. v. Aetna Casualty & Surety Co.*, 113 F.3d 629, 636 (6th Cir. 1997). Indeed, as noted by the Kentucky Supreme Court:

> The rule of strict construction against an insurance company certainly does not mean that every doubt must be resolved against it and does not interfere with the rule that the policy must receive a reasonable interpretation consistent with the parties' object and intent or narrowly expressed in the plain meaning and/or language of the contract. Neither should a nonexistent ambiguity be utilized to resolve a policy against the company. We consider that courts should not rewrite an insurance contract to enlarge the risk to the insurer. *U.S. Fidelity & Guar. Co. v. Star Fire Coals, Inc.*, 856 F.2d 31 (6th Cir.1988).

*St. Paul Fire & Marine Ins. Co. v. Powell-Walton-Milward, Inc.*, 870 S.W.2d 223, 226-227 (Ky. 1994). Thus, "[w]hen the terms of an insurance contract are unambiguous and not unreasonable,

they will be enforced." *Kentucky Ass'n of Counties All Lines Funds Trust v. McClendon*, 157 S.W.3d 626, 630 (Ky. 2005).

As noted above, exceptions and exclusions in insurance policies are to be narrowly construed to effectuate insurance coverage. However, this strict construction should not overcome "plain clear language resulting in a strained or forced construction." *Kemper*, 82 S.W.3d at 873-874 (quoting *Diamaco, Inc. v. Aetna Casualty & Surety Co.*, 97 Wash.App. 335, 983 P.2d 707 (1999)). "Reasonable conditions, restrictions and limitations on insurance coverage are not deemed *per se* to be contrary to public policy." *Snow v. West American Ins. Co.* 161 S.W.3d 338, 341 (Ky. App. 2004).

In Kentucky, an insurer's duty to defend is broader than the duty to indemnify. *James Graham Brown Foundation, Inc. v. St. Paul Fire & Marine Ins.*, 814 S.W.2d 273, 280 (Ky. 1991).[4] "Under Kentucky law, a court should determine at the outset of litigation whether an insurance company has a duty to defend its insured by comparing the allegations in the underlying complaint with the terms of the insurance policy." *Westfield Ins. Co. v. Tech Dry, Inc.*, 336 F.3d 503, 507 (6th Cir. 2003). *See also Lenning v. Commercial Union Ins. Co.*, 260 F.3d 574, 581 (6th Cir. 2001). "An insurance company has a duty to defend its insured if the language of an underlying complaint against the insured brings the action within the scope of the insurance contract." *Westfield Ins. Co.*, 336 F.3d at 507. *See also Dibeneditto v. Medical Protective Co.*, 3 Fed.Appx. 483, 485 (6th Cir. 2001)(unpublished)("Kentucky courts have made it clear that allegations in a complaint are not by themselves sufficient to trigger the duty to defend, but rather, the obligation to defend arises out of

---

[4]Consequently, if there is no duty to defend, then there is no duty to indemnify. *Nautilus Ins. Co. v. Structure Builders & Riggers Machinery Moving Division, LLC*, 784 F.Supp.2d 767, 771 (E.D.Ky. 2011).

the language of the insurance contract.")(citing *Thompson v. West American Ins. Co.*, 839 S.W.2d

579, 581 (Ky.Ct.App.1992))(other citations omitted)); *James Graham Brown Foundation, Inc.*, 814

S.W.2d at 279-280 (Ky. 1991)("The insurer has a duty to defend if there is any allegation which

potentially, possibly or might come within the coverage of the policy.  The insurance company must

defend any suit in which the language of the complaint would bring it within the policy coverage

regardless of the merit of the action.")(citations omitted).  Thus, the Court must closely examine both

the language of BGS's complaint and the language of the Policy to determine whether coverage

exists in this case.

    B.    <u>Applicable Policy Provisions</u>

The Policy contains a grant of coverage as to liability for "property damage."  Under the

Policy, "property damage" is defined as follows:

28.    "Property Damage" means:

    a.    Physical injury to tangible property, including all resulting loss of use of that property.  All such loss of use shall be deemed to occur at the time of the physical injury that caused it; or

    b.    Loss of use of tangible property that is not physically injured.  All such loss of use shall be deemed to occur at the time of the "occurrence" that caused it.

For the purposes of this insurance, electronic data is not tangible property.

As used in this definition, electronic data means information, facts or programs stored as or on, created or used on, or transmitted to or from, computer software, including systems and applications software, hard or floppy disks, CD-ROMS, tapes, drives, cells, data processing devices or any other media which are used with electronically controlled equipment.

(Policies, p. 35; 2009 Policy, p. 32).

The following exclusions apply to the coverage provided under the Policy for property

damage liability:

9

2.      **Exclusions**

This insurance does not apply to:

a.      **Expected or Intended Injury**

"Bodily injury" or "property damage" expected or intended from the standpoint of the insured.  This exclusion does not apply to "bodily injury" resulting from the use of reasonable force to protect persons or property.

b.      **Contractual Liability**

"Bodily injury" or "property damage" for which the insured is obligated to pay damages by reason of the assumption of liability in a contract or agreement.  This exclusion does not apply to liability for damages:

(1)      That the insured would have in the absence of the contract or agreement; or

(2)      Assumed in a contract or agreement that is an "insured contract", provided the "bodily injury" or "property damage" occurs subsequent to the execution of the contract or agreement.  Solely for the purposes of liability assumed in an "insured contract", reasonable attorney fees and necessary litigation expenses incurred by or for a party other than an insured are deemed to be damages because of "bodily injury" or "property damage", provided:

(a)      Liability to such party for, or for the cost of, that party's defense has also been assumed in the same "insured contract"; and

(b)      Such attorney fees and litigation expenses are for defense of that party against a civil or alternative dispute resolution proceeding in which damages to which this insurance applies are alleged.

(Policies, p. 17; 2009 Policy, p. 17).

The Policy contains a separate grant of coverage for liability for "personal and advertising injury," defined as follows:

10

25.     "Personal and advertising injury" means injury, including consequential "bodily injury," arising out of one or more of the following offenses:

a.     False arrest, detention or imprisonment;

b.     Malicious prosecution;

c.     The wrongful eviction from, wrongful entry into, or invasion of the right of private occupancy of a room, dwelling or premises that person occupies, committed by or on behalf of its owner, landlord or lessor;

d.     Oral or written publication, in any manner, of material that slanders or libels a person or organization or disparages a person's or organization's goods, products or services;

e.     Oral or written publication, in any manner, of material that violates a person's right of privacy;

f.     The use of another's advertising idea in your "advertisement"; or

g.     Infringing upon another's copyright, trade dress or slogan in your "advertisement".

(Policies, p. 34; 2009 Policy, p. 32).

In addition, "advertisement" is defined as follows:

1.     "Advertisement" means a notice that is broadcast or published to the general public or specific market segments about your goods, products or services for the purposes of attracting customers and supporters.

For purposes of this definition:

a.     Notices that are published include material placed on the Internet or on similar electronic means of communication; and

b.     Regarding web-sites, only that part of a web-site that is about your goods, products or services for the purposes of attracting customers or supporters is considered an advertisement.

(Policies, p. 31; 2009 Policy, p. 32).

Finally, with respect to "personal and advertising injury," the Policy specifies the following

exclusions to coverage that apply:

11

2.      **Exclusions**
This insurance does not apply to:

a.      **Knowing violation of Rights of Another**
"Personal and advertising injury" caused by or at the direction of the insured with the knowledge that the act would violate the rights of another and would inflict "personal and advertising injury."
...

d.      **Contractual Liability**
"Personal and advertising injury" for which the insured has assumed liability in a contract or agreement.  This exclusion does not apply to liability for damages that the insured would have in the absence of the contract or agreement.

e.      **Breach of Contract**
"Personal and advertising injury" arising out of a breach of contract, except an implied contract to use another's advertising idea in your "advertisement."
...

h.      **Infringement of Copyrights, Patent, Trademark or Trade Secret**
"Personal and advertising injury" arising out of the infringement of copyright, patent, trademark, trade secret or other intellectual property rights.
...

j.      **Unauthorized Use of Another's Name or Product**
"Personal and advertising injury" arising out of the unauthorized use of another's name or product in your email address, domain name or metatag, or any other similar tactics to mislead another's potential customers.

(Policies, pp. 21-22; 2009 Policy, pp. 20-21).

The Court now turns to the allegations of BGS's complaint to determine whether there is any allegation which potentially comes within the coverage provided by the Policy.

C.      Count I - Misappropriation of Trade Secrets

Count I of BGS's second amended complaint, misappropriation of trade secrets, is based on BGS's allegations that Denninghoff and SSO improperly acquired, disclosed, and used confidential

information from the backup of the BGS Database Backup,[5] including the names and email addresses of thousands of BGS's customers [5:10-cv-00390, DE #73 at ¶¶ 65-74].  BGS further alleges that Denninghoff disclosed BGS's confidential information to SSO, and that SSO used this information, with full knowledge that the information had been obtained by Denninghoff through means that were both improper and that violated the terms of his Non-Compete Agreement with BGS [*Id.*].

Liberty first argues that the alleged misappropriation of BGS's trade secrets (the customer database) cannot constitute property damage under the Policy, as the terms of the Policy limit "property damage" to tangible property that is physically damaged or suffers loss of use.  SSO responds by construing BGS's claim as a claim relating to mass mailings sent out by SSO to BGS's customer emails using the "converted" BGS customer email lists.  SSO then states, with no citation to any authority, that the customer email list is a tangible piece of property.  However, this argument ignores the general definition of "tangible property."  *Black's Law Dictionary* defines "tangible property" as "[p]roperty that has physical form and characteristics."  *Black's Law Dictionary* (9th ed. 2009).  It is significant that what BGS alleges was misappropriated were BGS's customer's email addresses obtained from an electronic backup copy of BGS's customer database.  Because such "property" has no physical form or characteristics, it simply does not fall within the definition of "tangible property."  Moreover, the terms of the Policy clearly and unequivocally exclude "electronic data," including information stored, created or used on computer software, from the definition of "tangible property." Information obtained from BGS's customer database falls squarely within this exclusion.  "Where the terms of an insurance policy are clear and unambiguous, the policy will be

---

[5]Defined in the second amended complaint as a "backup of BGS's customer database dated September 4, 2009, containing names, email addresses, and other data regarding 204,058 persons throughout the United States" [5:10-cv-00390, DE #73 at ¶ 54].

enforced as written." *Kemper*, 82 S.W.3d at 873 (citations omitted). Because there are no allegations involving the misappropriation of "tangible property," the misappropriation of trade secrets claim against SSO and Denninghoff is not covered as a "property damage" claim under the Policy. Although Liberty puts forth several alternative arguments regarding why Count I is not covered as a claim for "property damage," because it is clear that the property allegedly misappropriated (the customer database) does not constitute "tangible property," both as that term is generally understood, and also as that term is used in the Policy, the Court need not address these additional arguments.

Liberty further argues that the alleged misappropriation of BGS's trade secrets cannot constitute "personal and advertising injury" under the Policy because this claim does not fall within any of the categories of "personal and advertising injury" specified in the Policy. SSO argues that this claim constitutes "the use of another's advertising idea in your advertisement," which is covered under the Policy as "personal and advertising injury." Liberty points out that the Policy defines "advertisement" as "a notice that is broadcast or published to the general public or specific market segments about your goods, products or services for the purposes of attracting customers and supporters." According to Liberty, because BGS's customer database is not a notice that is broadcast or published, it cannot be an "advertisement." However, Liberty overlooks that BGS's misappropriation claim not only alleges that SSO and Denninghoff improperly obtained information from BGS's database, but that it also used this information to generate email "blasts" from SSO to BGS's customers. These email "blasts" would appear to constitute a notice that is broadcast to a specific market segment about SSO's goods, products or services for the purpose of attracting customers, and, accordingly, potentially fall within the Policy's definition of an "advertisement."

Thus, BGS's claim for misappropriation of trade secrets is potentially covered as a "personal or advertising injury" under the Policy.

However, the Policy giveth and the Policy taketh away. Liberty argues that, even if BGS's trade secret misappropriation claim does allege "personal or advertising" injury, coverage is precluded for this claim by the exclusions for breach of contract. The Policy specifically provides that coverage is not provided for "'personal and advertising injury' arising out of a breach of contract, except an implied contract to use another's advertising idea in your 'advertisement'" (Policies, p. 20, 2009 Policy p. 20). Liberty relies on an unpublished Sixth Circuit opinion, *Capitol Specialty Ins. v. Industrial Electronics, LLC*, 407 Fed.Appx. 47 (6th Cir., Jan. 12, 2011). In *Capitol Speciality Ins.*, an employee (Osyka) of the insured (Indel) allegedly disclosed customer and pricing lists, as well as other proprietary information, belonging to Osyka's prior employer (ICS) to his new employer, Indel. *Id*. at 48. This disclosure was allegedly in violation of non-disclosure and confidentiality provisions of Osyka's employment contract with ICS. *Id*. ICS also claimed that Indel used this information to its advantage and to the detriment of ICS. *Id*. ICS sued Osyka and Indel in state court, claiming: (1) that Indel tortiously interfered with ICS's business relationship with Osyka by intentionally and improperly using ICS's trade secrets and proprietary information; (2) Osyka breached his contract with ICS by disclosing proprietary and trade secret information to Indel; and (3) that Osyka and Indel violated the Kentucky Uniform Trade Secrets Act. *Id*. Indel sought coverage under a commercial general liability policy issued by Capitol. *Id*. Capitol filed a declaratory judgment action in federal court, seeking a declaration that it had no duty to defend or indemnify Indel and Osyka in the underlying state court action. *Id*.

On its motion for summary judgment, Capitol argued that the allegations of the underlying state court action fell outside the Policy's coverage for "personal and advertising injury," the only

15

possible basis for coverage. *Id.* at 48-49. Capitol further argued that, even if the allegations of ICS's complaint did fall within the Policy, coverage was excluded by various exclusions, including an exclusion for breach of contract. *Id.* Notably, the "breach of contract" exclusion in the policy at issue excluded coverage for "'[p]ersonal and advertising injury' arising out of a breach of contract, except an implied contract to use another's advertising idea in your 'advertisement.'" *Id.* at 49. Thus, the language of the exclusion at issue in *Capitol Specialty Ins.* is identical to the "breach of contract" exclusion at issue in this case.

After noting that the phrase "arising out of" should be construed broadly under Kentucky law, the Sixth Circuit held that the exclusion applied, as ICS's claims against both Osyka and Indel arose directly from Osyka's breach of contract. *Id.* at 50-51. As the Court explained, "Indel's use of ICS's proprietary and trade secret information - the basis of both the tortious interference and the statutory claims - grew out of, or flowed from, Osyka's dissemination of such information to Indel. Without Osyka's breach, Indel would have no information." *Id.* at 51. The fact that ICS sued only Osyka, and not Indel, for breach of contract was of no consequence, as the exclusion requires only that the injury arise out of "*a* breach of contract." *Id.* (emphasis in original). The Court found that "[t]his condition would be satisfied whether Osyka, Indel, or some other party breached a contract, and even regardless of whether ICS actually pled a breach of contract claim, so long as the asserted claims arose out of the breach." *Id.*

In this case, BGS's complaint alleges that SSO improperly acquired BGS's customer database through Denninghoff, who had secretly and improperly kept the BGS Database Backup and other backup copies of BGS's customer database after leaving his employment with BGS [5:10-cv-390, DE #73 at ¶¶ 69-70]. The complaint further alleges that Denninghoff's disclosure of this information to SSO violated the terms of his Non-Compete Agreement with BGS [*Id.* at ¶ 71]. Thus,

16

just as in *Capitol Specialty Ins.*, according to the allegations of BGS's complaint, SSO's use of BGS's proprietary and trade secret information - the basis of the misappropriation claim - grew out of, or flowed from, Denninghoff's dissemination of such information to SSO.   Without Denninghoff's breach of his Non-Compete Agreement, SSO would have no information. Accordingly, the Court finds that, under the clear and unambiguous language of the breach of contract exclusion, there is no coverage under the "personal and advertising injury" provisions of the Policy for the trade secret misappropriation claim.

For all of these reasons, to the extent that Liberty's motion for summary judgment seeks a declaration that there is no coverage for Count I, trade secret misappropriation, Liberty's motion shall be granted.

D. Count II, Trademark Infringement and Count III, Breach of Tradename License Agreement

In Count II, BGS alleges trademark infringement in violation of 15 U.S.C. § 1125, the Lanham Act [5:10-cv-390, DE #73].   Specifically, BGS alleges that, although SSO had a non-exclusive license to use the "Bud's Gun Shop" mark and similar marks pursuant to the Tradename License Agreement between the parties, SSO's breach of that agreement caused the License to immediately terminate [*Id.*].   BGS further alleges that, notwithstanding the termination of this License Agreement, SSO has knowingly continued to use the "Bud's Gun Shop" trademark in a variety of ways to promote its business with its suppliers and the consuming public and that this use has damaged BGS by causing harm to BGS's identity, reputation, and goodwill and by causing actual confusion among buyers and sellers in the firearms market and more generally among the consuming public [*Id.*].   Similarly, in Count III, BGS brings a breach of contract claim against SSO for its breach of the Tradename License Agreement [*Id.*].   Specifically, BGS alleges that, despite the fact

17

that, as early as July 2009, SSO's over-the-counter sales of firearms from its retail store comprised less than 85% of its total sales of firearms during multiple calendar month periods, SSO continued to use the Bud's tradename, all in material breach of the Tradename License Agreement [*Id.*].

Liberty argues that the claim for trademark infringement cannot constitute property damage under the Policy, as the terms of the Policy limit "property damage" to coverage for tangible property that is physically damaged or suffers loss of use. Liberty similarly argues that the breach of contract claim in Count III does not allege property damage. In response, SSO argues that the damages claimed by BGS - including the harm to BGS's identity, reputation and goodwill - are property damages. However, SSO completely overlooks that the question is not whether BGS seeks property damages. Rather, under the terms of the Policy, there is only coverage if BGS claims damage to *tangible* property that is physically damaged or suffers loss of use. Neither identity, reputation nor goodwill constitutes property that has "physical form and characteristics," and, therefore, none is tangible property. *Black's Law Dictionary* (9th ed. 2009). Indeed, identity, reputation and goodwill are quintessential examples of *intangible* property.

SSO also responds that the Policy's coverage for "loss of use of tangible property," "by its plain language, would include BGS's loss of the use of the 'Bud's' name for its products, after SSO allegedly breached the license agreement" [DE #38 at p.8]. However, SSO cites to no authority holding that the loss of a mark constitutes the loss of *tangible* property. More importantly, SSO overlooks that there are no allegations that BGS has lost the use of the "Bud's" name for its products. In fact, BGS's complaint alleges the complete opposite - it alleges that BGS continues to use, promote and advertise the Bud's Gun Shop Marks for its goods and services and that SSO's continued use of the "Bud's Gun Shop" name, allegedly in violation of the License, has caused confusion in the marketplace [5:10-cv-390, DE #73 at Count II].

Finally, SSO argues that "[p]resumably one of the damages asserted by BGS as a result of SSO's unauthorized email blast advertisement would be its inability to sell those goods that were lost to SSO by virtue of the advertisements" [DE #38 at p.10].[6]  SSO then claims that "[v]arious courts have held this to be a property damage as defined as 'loss of use of tangible property that is not physically injured,'" citing *Lucker Mfg. Inc. v. Home Ins. Co.*, 23 F.3d 808, 816-817 (3d Cir. 1994)[*Id.*].  However, SSO grossly misrepresents the Court's holding in *Lucker*.  In *Lucker*, the Court analyzed whether, in a Comprehensive General Liability Insurance ("CGL") policy, "the clause 'loss of use of tangible property that has not been physically injured' covered costs of preventing a defective component from becoming incorporated into a product that has been designed but has not yet been manufactured." *Id.* at 810.  The Court separated the inquiry into two parts: (1) whether a change in demand for a product in the marketplace brought about by the insured's wrongful act constitutes a "loss of use"; and (2) whether a design for a product is "tangible property." *Id.* at 811.  The quote selectively cited by SSO - "the loss of a non-physical use of a product, such as offering it for sale, should be considered a "loss of use"; and that the decreased value of a product because of loss of customer acceptance of the product is a "loss of use" within the meaning of the standard CGL policy" - appears in the portion of the Court's opinion discussing whether a change in demand for a product is a loss of use.  *Id.* at 814-818.  SSO then stretches this quote to suggest that *Lucker* held that such "loss of use" property damage is necessarily the "loss of use of *tangible* property," ignoring that the word "tangible" does not appear once in this entire section of the Court's

---

[6]SSO's reliance on BGS's allegations regarding SSO's unauthorized email blast advertisement resulting from the alleged theft of BGS's customer database in support of its argument that coverage should be found for Counts II and III of BGS's complaint is curious, given that Counts II and III relate solely to SSO's alleged breach of the Trademark License Agreement.  BGS does not mention the alleged theft of the customer database or SSO's email blasts in Count II or Count III.

opinion. *Id.* In fact, the Court in *Lucker* held that, in that case, even though there was "loss of use" damage, the property that was allegedly damaged was *not* tangible property, therefore there was no coverage under the CGL policy at issue. *Id.* at 818. Incredibly, SSO also overlooks that the *Lucker* Court points to goodwill, reputation, profits, trademarks and trade secrets - the "property" allegedly damaged in this case - as examples of *intangible* property. *Id.* at 819. Suffice it to say, SSO's reliance on *Lucker* is misplaced.

For all of these reasons, the Court finds that neither Count II nor Count III of BGS's complaint allege "property damage" under the terms of the Policy. Therefore, the Court finds that there is no coverage for either the trademark infringement claim (Count II) or the breach of contract claim (Count III) under the "property damage" provisions of the Policy.

Liberty further argues that there is no coverage for Count II under the "personal and advertising injury" provisions of the Policy, as the clear and unambiguous language of the Policy states that "[t]his insurance does not apply to...'personal and advertising injury' arising out of the infringement of copyright, patent, trademark, trade secret or other intellectual property rights" [Policies, pp. 21; 2009 Policy, pp. 20-21]. According to Liberty, because Count II solely and specifically alleges that SSO improperly utilized BGS's marks, there is no coverage under the Policy for this claim. Moreover, Liberty argues that there is no coverage for the Count III breach of contract claim under the "personal and advertising injury" provisions of the Policy, as this claim does not allege "personal and advertising injury" as defined by the Policy.

SSO responds that the Policy provides coverage for "personal and advertising injury" arising out of oral or written publication, in any manner, of material that disparages a person's or organization's goods or services. Because Counts II and III of BGS's complaint allege that SSO's use of the "Bud's Gun Shop" mark caused harm to - or disparaged - BGS's identity, reputation and

20

good will, SSO argues that these allegations come within the coverage provided under "personal and advertising injury" for disparagement.  However, this argument ignores the clear and unambiguous language of the Policy precluding coverage for a claim arising out of the infringement of trademark or other intellectual property rights.  Kentucky law is clear exclusions that are "unequivocally conspicuous, plain and clear" will be enforced.  *Kentucky Ass'n of Counties All Lines Fund Trust*, 157 S.W.3d at 634.  Notwithstanding BGS's allegation that SSO's use of BGS's mark "disparaged" BGS's good will, BGS's claim in Count II is still a claim for trademark infringement, the very claim for which the Policy explicitly precludes coverage.

SSO also attempts to characterize BGS's claim that SSO's use of the tradename "Bud" and "Bud's Gun Shop" in violation of the Lanham act as a claim "under 'trade dress' or 'copyright' or 'slogan'" rather than a claim involving a trademark.  Although it is not clear, presumably, by attempting to characterize BGS's claim as a "trade dress" or copyright claim, SSO is attempting to get around the exclusion for trademark infringement claims.  However, "[t]rademarks and trade dress are separate and distinct causes of action under the Lanham Act."  *General Motors Corp. v. Lanard Toys, Inc.*, 468 F.3d 405, 414 (6th Cir. 2006)(citations omitted).  In *Gibson Guitar Corp. v. Paul Reed Smith Guitars, LP*, 423 F.3d 539, 547 (6th Cir. 2005), the Sixth Circuit explained that "[t]he Lanham Act defines a trademark as 'any word, name, symbol, or device, or any combination thereof' which is used or intended to be used by a person 'in commerce...to identify and distinguish his or her goods, including a unique product, from those manufactured or sold by others and to indicate the source of the goods, even if that source is unknown.'"  *Id.* (quoting 15 U.S.C. § 1127).  However, "[b]y contrast, trade dress is not explicitly defined in the Lanham Act, but has been described by the Supreme Court as the 'design or packaging of a product' which has acquired a 'secondary meaning' sufficient 'to identify the product with its manufacturer or source.'"  *Id.* (quoting *TrafFix Devices,*

*Inc. v. Mktg. Displays, Inc.*, 532 U.S. 23, 28 (2001)).  Count II of BGS's complaint clearly alleges that SSO continued to use various BGS marks, despite the expiration of the Tradename License, in violation of the Lanham Act.  There are no allegations regarding the design or packaging of a product, or any other similar allegations regarding the image of a product, that would suggest that BGS's claim was actually a trade dress claim.

SSO also attempts to create an ambiguity by arguing that it is confusing for the Policy to include "[i]nfringing upon another's copyright, trade dress or slogan in your 'advertisement'" within the definition of "personal and advertising injury," while subsequently excluding coverage for "'personal and advertising injury' arising out of the infringement of copyright, patent, trademark, trade secret or other intellectual property rights."  According to SSO, because the average man would not know the difference between trademark and trade dress, the Court should strike this exclusion and find coverage and/or a duty to defend.

It is true that, in Kentucky, under the reasonable expectations doctrine, ambiguous terms in an insurance contract must be interpreted in favor of the insured's reasonable expectations and construed as an average person would construe them.  But, "[o]nly actual ambiguities, not fanciful ones, will trigger application of the doctrine."  *True v. Raines*, 99 S.W.3d 439, 443 (Ky. 2003). Indeed, "[a] non-existent ambiguity [should not] be utilized to resolve a policy against an insurer. It is not enough for one party to claim ambiguity.  The mere fact that [a party] attempt[s] to muddy the water and create some question of interpretation does not necessarily create an ambiguity." *Kentucky Ass'n of Counties All Lines Fund Trust*, 157 S.W.3d at 633-634 (citations omitted)(alterations in original).  Exclusions that are "unequivocally conspicuous, plain and clear" will be enforced.  *Id*. at 634.

Under Kentucky law, "[a] contract is ambiguous if a reasonable person would find it susceptible to different or inconsistent interpretations." *Wehr Constructors, Inc. v. Assurance Co. of America*, 384 S.W.3d 680, 687 (Ky. 2012)(quoting *Hazard Coal Corp. v. Knight*, 325 S.W.3d 290, 298 (Ky. 2010)). Here, there is nothing ambiguous about the Policy's exclusion of coverage for claims of trademark infringement. Indeed, it would be patently unreasonable for a person to believe that the clear language of the Policy excluding coverage for personal and advertising injury "arising out of the infringement of...trademark, trade secret or other intellectual property rights" means anything other than such claims are excluded from coverage. Because the language of the Policy is unambiguous, the "reasonable expectations" doctrine is inapplicable. Accordingly, the Court finds that the exclusion of coverage for "personal and advertising injury" arising out of trademark infringement applies, thus precluding coverage for Count II of BGS's complaint.

SSO does not point the Court to any other category of "personal and advertising injury" as defined by the Policy that would purportedly include coverage for the Count III breach of contract claim. Indeed, BGS's breach of the Trademark License Agreement claim does not allege injury arising out of false arrest, detention or imprisonment; malicious prosecution; wrongful eviction from or wrongful entry into property; or oral or written publication of material violating a person's right of privacy. Thus, there are no grounds for finding that Count III is covered as "personal and advertising injury." Accordingly, the Court finds that BGS's claim for breach of contract in Count III does not allege "personal and advertising injury." Thus, there is no coverage for this claim under the Policy.

In the alternative, Liberty argues that, even if "personal and advertising injury" were alleged, coverage for Counts II and III is also excluded under the Policy's exclusion of coverage for "'personal and advertising injury' arising out of a breach of contract, except an implied contract to

23

use another's advertising idea in your 'advertisement'" [Policies p. 21; 2009 Policy p. 21].

According to Liberty, because the trademark infringement claim arises solely because SSO allegedly

failed to comply with the License Agreement between the parties, which otherwise authorized SSO's

use of the marks, the breach of contract exclusion also applies to bar coverage for the claim.  Liberty

relies on the allegations of BGS's complaint, which specify that Count II arises only and directly

from SSO's alleged breach of the License Agreement between the parties, as well as the broad

interpretation of the phrase "arising under" applied by the Sixth Circuit in *Capitol Specialty Ins.*, 407

F.App'x. at 51, discussed above.  Similarly, because Count III is a claim for breach of contract, there

can be no doubt that Count III arises out of a breach of contract claim.

SSO does not respond to Liberty's argument that the exclusion for personal and advertising

injury arising from breach of contract bars coverage for Count II's trademark infringement claim or

for Count III's breach of contract claim, thus waiving the opportunity.  *Guarino v. Brookfield Tp.*

*Trustees*, 980 F.2d 399, 405 (6th Cir. 1992)(on a motion for summary judgment, the non-moving

party's burden to respond by showing that there is a genuine issue for trial "is really an opportunity

to assist the court in understanding the facts.  But if the non-moving party fails to discharge that

burden - for example, by remaining silent - its opportunity is waived and its case is wagered.").  This

reason alone is sufficient to find in Liberty's favor with respect to these claims.  Even so, under

Kentucky law, "each exclusion is to be read independently of every other exclusion."  *Kemper*, 82

S.W.3d at 874 (citations omitted).  As explained in *Kemper*, "Because an exclusion is not an

affirmative grant of coverage - and each exclusion is independent of all others - any applicable

exclusion is sufficient to remove coverage.  In other words, '[i]f any one exclusion applies there

should be no coverage, regardless of inferences that might be argued on the basis of exceptions or

qualifications contained in other exclusions.'"  *Id*. at 874 (quoting *Weedo v. Stone-E-Brick, Inc.*, 81

N.J. 233, 405 A.2d 788, 790 (1979), quoting *Tinker*, "Comprehensive General Liability Insurance - Perspective and Overview" 25 Feder. Ins. Coun. Q. 217, 223 (1975)).   Here, the Court finds that, because BGS's claim arises directly from SSO's alleged breach of the Tradename License Agreement, even if the trademark infringement exclusion did not apply, the breach of contract exclusion independently precludes coverage for Count II of BGS's complaint.   Similarly, because there can be no question that Count III's breach of the Tradename License Agreement arises out of a breach of contract claim, the breach of contract exclusion also precludes coverage for that claim.   Accordingly, the Court finds that Liberty is entitled to summary judgment with respect to coverage for Count II, the trademark infringement claim, and Count III, the breach of contract claim.

     E.    <u>Remaining Counts of BGS's Second Amended Complaint</u>

The remaining counts of BGS's second amended complaint are as follows: Count IV - breach of fiduciary duty (against Denninghoff); Count V - aiding and abetting breach of fiduciary duty (against SSO); Count VI - breach of contract - non-compete agreement (against Denninghoff); Count VII - tortious interference with contract (against SSO); Count VIII - violation of 18 U.S.C. § 1030(a)(2)(the "Computer Fraud and Abuse Act"); Count IX - violation of 18 U.S.C. § 1030(a)(4); Count X - violation of K.R.S. § 434.845 (unlawful access of computer); and Count XI - violation of K.R.S. § 434.855 (misuse of computer information) [5:10-cv-390, DE #73].   The complaint also seeks injunctive relief and exemplary and/or punitive damages [*Id*.].   Liberty argues that coverage is precluded for each of these claims for various reasons, including that these claims do not allege property damage or personal and advertising injury and that, even if they did, coverage is precluded by various specific exclusions.   SSO has chosen not to respond to any of these arguments.   For this reason alone, summary judgment in Liberty's favor may be appropriate.   *Guarino*, 980 F.2d at 405 (6th Cir. 1992).

Regardless of SSO's failure to respond, the Court has reviewed the terms of the Policy and the allegations of BGS's complaint and agrees with Liberty's arguments that none of the above counts allege property damage. Rather, these claims all relate to the alleged improper procurement, disclosure and use of confidential information and data on BGS's computer network system. As discussed above, information on BGS's computer system, including its customer database, is not tangible property, thus these claims do not allege property damage.

With respect to the Policy's coverage for "personal and advertising injury," there are no allegations of injury arising out of false arrest, detention or imprisonment; malicious prosecution; wrongful eviction from or wrongful entry into property; oral or written publication of material violating a person's right of privacy; or infringing upon another's copyright, trade dress or slogan in an advertisement. As discussed above, to the extent that these claims allege that SSO and Denninghoff used the improperly acquired information to generate email blasts to customers, these claims could potentially be considered to allege "personal and advertising injury" arising from the use of another's advertising idea in an advertisement. However, even if these allegations potentially alleged "personal and advertising injury," these claims all arise from the allegations of Denninghoff's improper access and disclosure of BGS's confidential information, in breach of his non-compete agreement with BGS. Thus, these claims arise out of breach of contract and, accordingly, coverage is precluded by the breach of contract exclusions contained in the Policy. *Capitol Specialty Ins.*, 407 F.App'x at 51.

For all of these reasons, the Court finds that the Policy does not provide coverage for any of the remaining counts of BGS's second amended complaint. Accordingly, Liberty is entitled to summary judgment.

F.      Remainder of Liberty's Motion

Liberty seeks a declaration that no coverage is provided for BGS's claim for injunctive relief, as language in the Policy that limits the applicability of the Policy to claims for liability and does not include equitable relief (Policies, p. 16; 2009 Policy, p. 16; Policies, p. 21; 2009 Policy, p. 20). However, because the Court finds that the Policy does not provide coverage for any of the damages alleged by BGS, it is unnecessary to decide whether, even if the Policy provided coverage, this coverage would be for liability only and would not extend to any equitable relief.  Similarly, the Court need not consider Liberty's request for a declaration that the Policy does not provide coverage for any claims for exemplary or punitive damages.  In addition, because the Court has found that there is no coverage for any of the claims made against Denninghoff, it is unnecessary for the Court to determine whether he is an "insured" under the Policy.

IV.    **CONCLUSION**

For the reasons set forth above, the Court finds the Policy does not provide coverage to SSO and/or Denninghoff for the claims made against them in the underlying litigation.  Accordingly, Liberty has no duty to defend or indemnify SSO and/or Denninghoff with respect to these claims. Thus, Liberty's motion for summary judgment shall be granted.

For all of the foregoing reasons, the Court, being fully and sufficiently advised, **HEREBY ORDERS** that:

(1)    The Policy at issue does not provide coverage to Defendants Security Safe Outlet, Inc., d/b/a Bud's Gun Shop and/or Matthew Denninghoff for the claims made against them in the underlying litigation, *Budsgunshop.com, LLC v. Security Safe Outlet, Inc., et al.*, Case # 5:10-cv-390, pending in the United States District Court, Eastern District of Kentucky;

(2)    Liberty is not obligated or required to defend or indemnify SSO or Denninghoff with respect to the claims made against them in the underlying litigation;

(3)     Liberty has no other obligation or duty to either Budsgunshop.com, Marion E. Wells, Jr., Rex McClanahan, or any other party, arising out of the claims made in the underlying litigation;

(4)     Liberty's motion for summary judgment [DE #37] is **GRANTED**;

(5)     Liberty's request for oral argument is **DENIED**;

(6)     All matters having been resolved in this case, judgment in favor of Plaintiff shall be entered contemporaneously with this Opinion & Order pursuant to Fed. R. Civ. Pro. 58; and

(7)     this matter is **STRICKEN** from the active docket.

This March 27, 2013.

Signed By:

_Karl S. Forester_   𝒦𝒮𝓕

**United States Senior Judge**

28